A99A1152. MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA v. GEORGIA PUBLIC SERVICE COMMISSION et al.
(525 SE2d 399)

BARNES, Judge.

The Municipal Electric Authority of Georgia ("MEAG") appeals a superior court decision affirming an order of the Georgia Public Service Commission ("PSC"). MEAG contends that it has the legal authority to apply to the PSC for a certificate to offer telecommunications services to the public for hire, either by the terms of its enabling statute or by Federal Telecommunications Act preemption. We disagree and affirm the superior court's opinion.

MEAG is a public corporation created by the legislature "to function without profit in developing and promoting for the public good in this state adequate, dependable, and economical sources and supplies of bulk electric power and energy. . . ." OCGA § 46-3-110. Under the Georgia Code, MEAG is to acquire, construct, operate, and maintain electric generation and transmission facilities. OCGA § 46-3-125.

In December 1997, the Superior Court of Fulton County confirmed and validated MEAG's revenue bonds totaling $35 million, to be used to fund the construction and acquisition costs of an internal telecommunications system. MEAG sought to build this internal system to improve its operations in various ways, such as adding the ability to monitor system conditions and control system devices remotely, isolate faults within a fraction of a second, and manage

---

could not have provided the evidentiary basis for an award of damages on summary judgment.

energy resources. The superior court also validated MEAG's telecommunications project contracts with 31 municipalities and Crisp County but specifically declined to address whether MEAG had the legal right to offer telecommunications services to the public for hire. Such sales require a certificate from the PSC, the court concluded.

Before the superior court's December 1997 ruling, MEAG petitioned the PSC for a declaratory ruling that it is authorized by the MEAG Act, the Georgia Telecommunications & Competition Development Act (OCGA § 46-5-162 (17)), and the Federal Telecommunications Act (47 USC § 151 et seq.) to apply for a certificate of authority to provide telecommunications services to the public. The commission granted motions to intervene by BellSouth and the Cable TV Association of Georgia. After a two-day evidentiary hearing, the majority of commissioners concluded in March 1998 that MEAG "did not have the authority to apply for or obtain a certificate of authority to offer or provide telecommunications services to the public for hire." The commission made three specific findings of fact and conclusions of law in its order: (1) MEAG can exercise only those powers that the legislature expressly or implicitly gave it, and those powers do not include offering telecommunications services to the public for hire; (2) the Georgia Telecommunications Act does not give MEAG "the authority to deviate from the purpose for which it was created" in order to offer telecommunications services to the public for hire "or otherwise to compete in the telecommunications industry"; and (3) the Federal Telecommunications Act does not preempt state law to permit MEAG to offer telecommunications services to the public.

MEAG petitioned the Superior Court of Fulton County for judicial review of the PSC's decision pursuant to OCGA § 50-13-19. The superior court affirmed, noting that public corporations

> can exercise only such powers as are conferred on them by law, and a grant of power to such corporations must be strictly construed. . . . The policy that is promoted by this rule avoids competition between private industry and a public corporation in a field that was not addressed as a need by the enabling statute.

The superior court found that the specific powers granting MEAG the ability to compete as a state authority in the private energy sector did not encompass telecommunications services, concluding that "[t]o allow MEAG to enter this separate industry would be opening up a '[P]andora's box' which the General Assembly could not have intended with the passage of this Act."

1. The superior court reviews the PSC's order to determine whether its findings of fact are supported by any evidence. *Sawyer v.*

*Reheis,* 213 Ga. App. 727, 728-729 (1) (445 SE2d 837) (1994). As we then review the superior court's actions, we again construe the evidence in favor of the decision rendered. *Ga. Power Co. v. Ga. Pub. Svc. Comm.,* 196 Ga. App. 572, 580 (5) (396 SE2d 562) (1990). However, both the superior court and this court review conclusions of law de novo. See OCGA § 50-13-19 (h); *St. Joseph's Hosp. v. Thunderbolt Health Care,* 237 Ga. App. 454, 456 (1) (517 SE2d 334) (1999); *Deweese v. Ga. Real Estate Comm.,* 136 Ga. App. 154-155 (1) (220 SE2d 458) (1975).

The parties disagree on whether this court should give great weight to the PSC's interpretation of the MEAG Act. We have held that an agency's interpretations of the statute it administers are entitled to great weight. *Kelly v. Lloyd's of London,* 255 Ga. 291, 293 (1) (b) (336 SE2d 772) (1985). However, the PSC does not administer MEAG. In fact, the MEAG Act specifically provides:

> [t]he rates, services, and practices relating to the generation, transmission, and sale by the authority of power to be generated from the projects authorized by [the MEAG Act] shall not be subject to the provisions of the Georgia Public Service Commission law nor to regulation by nor jurisdiction of the commission.

OCGA § 46-3-152. We conclude, therefore, that the PSC's interpretations of the MEAG Act are not entitled to great deference. Thus, we will review the PSC's interpretations of the MEAG Act de novo.

2. MEAG argues that it is authorized under its enabling statute to apply to the PSC for a certificate to sell its excess telecommunications capacity to the public for hire. MEAG's enabling statute does not specifically authorize it to offer telecommunications services to the public for hire, so we must look to see if that authority is necessarily implied from the express grant of other powers.[1] While MEAG's enabling statute provides that it "shall be liberally construed to effect the purposes hereof," OCGA § 46-3-155, the Supreme Court has held that "liberally" in this context does not mean "ultra-liberally." *Day v. Dev. Auth. of Adel,* 248 Ga. 488, 490 (284 SE2d 275) (1981).

(a) MEAG first contends that OCGA § 46-3-125 of the MEAG Act authorizes it to offer related services to third parties in order to take advantage of economies of scale. According to MEAG, the bond validation proceeding conclusively established that telecommunications is a "related service" under § 46-3-125 and therefore provides it with

---

[1] The statute vests MEAG with 11 specific grants of authority that permit it to act as a corporation by, for example, buying property, entering into contracts, suing or being sued, hiring employees, and selecting officers. OCGA § 46-3-126.

statutory authorization to sell its excess capacity. There are two fatal problems with this argument.

First, the superior court did not conclude that an internal telecommunications system was "related to" electrical power services; it decided that the proposed internal telecommunications system was a "sound, reasonable and feasible" project for which revenue bonds could be generated.

This statute provides that MEAG's purpose is

to take all other necessary or desirable action in order to provide or make available an adequate, dependable, and economical supply of electric power and energy and related services to those political subdivisions of this state identified in Code Section 46-3-130 which may desire the same and, incidentally and so as to take advantage of economies of scale in the generation and transmission of electric power and energy, to other persons and entities.

OCGA § 46-3-125. Second, OCGA § 46-3-125 does not authorize MEAG to take advantage of economies of scale in producing related services. If services useful to providing electricity were "related services," then the enabling statute would give MEAG the authority, for example, to go into the wire and cable manufacturing business, a result we believe the legislature did not intend.

(b) Also, MEAG contends that OCGA § 46-3-126 (10) implicitly grants it the ability to provide telecommunications services to the public for hire by empowering it "[t]o do any and all things necessary or proper for the accomplishment of the objectives of this article and to exercise any power usually possessed by private corporations performing similar functions. . . ."

In *Flint Elec. Membership Corp. v. Barrow*, 271 Ga. 636 (523 SE2d 10) (1999), the Supreme Court considered whether Flint Electric Membership Corporation was allowed to sell propane gas to its customers. The corporation's statutory purpose was "to engage in rural electrification," and the legislature gave it "all powers necessary or convenient to effect any or all of the purposes for which the electric membership corporation is organized." OCGA § 46-3-201 (b) (26). Our Supreme Court concluded that "it can hardly be said that it is 'necessary or convenient' for Flint to sell propane gas to accomplish its purposes." *Flint Elec.*, supra, 271 Ga. 636. We similarly reject MEAG's argument that its enabling statute, which provides that it can do whatever is necessary to accomplish its objectives — developing and selling electric power — authorizes it to sell its excess telecommunications capacity to the public for hire.

For the reasons discussed in Divisions 2 (a) and (b), the superior

court did not err in upholding the PSC's determination that the MEAG Act did not authorize MEAG to apply to the PSC for a certificate to offer its excess telecommunications capacity to the public for hire.

3. MEAG contends that the Federal Telecommunications Act preempts state law, requiring that the MEAG Act and the Georgia Telecommunications Act be construed to allow MEAG to offer telecommunications services to the public for hire.

The Federal Telecommunications Act of 1996 provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 USC § 253 (a). It further provides that

> [i]f, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) . . . of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

47 USC § 253 (d).

The U. S. Supreme Court has held that courts should not interpret federal law to preempt state sovereignty unless the language of the federal law clearly compels the intrusion. *Gregory v. Ashcroft*, 501 U. S. 452, 460-461 (II) (A) (111 SC 2395, 115 LE2d 410) (1991). In the only federal case we found that considered whether the Federal Telecommunications Act preempted a state statute restricting telecommunications sales, the D.C. Circuit Court of Appeals noted that Congress failed to define in the Telecommunications Act the "entity" whose telecommunications service offerings should not be restrained. *City of Abilene v. Fed. Communications Comm.*, 164 F3d 49 (D.C. Cir. 1999). Because the definition of "entity" was vague, the court concluded that the language of the federal law did not compel the conclusion that Congress intended to preempt state law on the issue. Id. at 52-53.

We also conclude that Congress did not clearly intend to include public corporations within the definition of "entity" under 47 USC § 253 (a). Without such a clear expression of congressional intent, the Federal Telecommunications Act does not preempt the MEAG Act. *Gregory*, supra, 501 U. S. at 460-461.

4. Because MEAG withdrew its enumeration asserting that the superior court and PSC erred in holding that MEAG lacked the authority to otherwise compete in the telecommunications industry,

we make no finding as to whether MEAG has the right to offer its excess telecommunications capacity in any manner other than to the public for hire.

For all of the above reasons, the superior court did not err in affirming the PSC ruling that the Federal Telecommunications Act did not preempt it from applying the MEAG Act to forestall MEAG from applying for a certificate to sell excess telecommunications capacity to the public for hire.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 16, 1999 —
RECONSIDERATION DENIED DECEMBER 3, 1999 —

*Alston & Bird, Peter M. Degnan, L. Clifford Adams, Jr.,* for appellant.

*Thurbert E. Baker, Attorney General, Robert S. Bomar, Deputy Attorney General, Harold D. Melton, Senior Assistant Attorney General, Thomas K. Bond, Assistant Attorney General,* for appellees.